FILED
2016 Nov-15  PM 04:17
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
<u>NORTHEASTERN DIVISION</u>**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **Case No: 5:15-cr-243-KOB-SGC** |
| | ) | |
| **JUSTIN ADAM WATSON,** | ) | |
| **DEFENDANT** | ) | |

<u>**SENTENCING MEMORANDUM AND REQUEST
FOR DOWNWARD DEPARTURE/VARIANCE**</u>

Comes now the Defendant, Justin Adam Watson, by and through counsel, and files this his

Sentencing Memorandum and Request for Downward Departure and/or Variance.   The following

sentencing memorandum is presented to this Honorable Court in an attempt to assist in imposing a

reasonable sentence for the crime for which Mr. Watson has plead guilty.

**I.   <u>STATEMENT OF THE CASE</u>**

On July 31, 2015, Mr. Watson was charged under an Indictment in the Northern District of

Alabama with two counts of Deprivation of Rights under Color of Law, 18 U.S.C. 242, (Counts 1

and 2), and three counts of Obstruction of Justice, 18 U.S.C 1512(b)(3), (Counts 3 thru 5).   (Doc.

1).   Count 5 charged Mr. Watson with Obstruction of Justice for Misleading Conduct, to wit, Mr.

Watson did knowingly and intentionally mislead a state court judge during a preliminary hearing

when he testified under oath that he had never seen Bryant before the night of the traffic stop, and

that he did not previously have an encounter with Bryant at Billy's Bar.   Disc.

JWATSON-000343-44.   On January 20, 2016, Mr. Watson plead guilty to Count 5 only.   This is

the sole charge for which we are before this Honorable Court for sentencing.

1

## II.    FACTUAL SUMMARY

The facts of this case that are beyond dispute are; 1) sometime near the end of June and beginning of July 2012 there was a fight at Billy's Bar that included, but was not limited to, Mr. Watson and Mr. Bryant, 2) Mr. Watson, while employed as a Madison County Sheriff's Deputy, initiated a traffic stop on August 22, 2012, the subject of which was Mr. Bryant, and 3) on December 12, 2012, Mr. Watson testified before a State District Court Judge Hundley that he had never seen Mr. Bryant before the night of the traffic stop and that he had not previously had an encounter with Mr. Bryant at Billy's Bar. Those are the undisputed facts of this case.

The government, through its sentencing memorandum, takes extreme license with those facts to portray a character that is inflammatory, prejudicial, and is factually inaccurate. The following is a selected portion taken from the discovery provided by the government to show how many of the statements made in the government's sentencing memorandum are, at minimum, misleading and/or a mischaracterization of what happened.  This Honorable Court may never know what really happened during any of these events except for the undisputed facts as laid out above. The following portion attempts to show the differences and mischaracterizations of the government's sentencing memorandum and follows portions thereof.

### a.  Fight At Billy's

Mr. Watson, his wife (then Fiancée), and several other co-workers or friends went out to celebrate his birthday near the end of June/beginning of July, 2012, where they ultimately ended up at Billy's Bar, Hazel Green, Alabama.[1]   There is no definitive account of what happened other

---

[1] Probably Friday June 29th or Saturday June 30th, 2012.

than Mr. Watson ended up at Billy's Bar with a few friends and coworkers.   Ross Hoffman was there with Robert Bryant and told Bryant to look at a girl.   Disc. JWATSON-000371.   According to Hoffman, Mr. Bryant made a comment like "Yea" at which point Mr. Watson approached and asked if they, the group, had been "meowing at my girl."   *Id.*   There was pushing between Mr. Bryant and Mr. Watson when Bryant threw a punch but missed because Watson fell.   *Id.* "Robert then grabbed him in a head lock."   *Id.*   A friend of Mr. Watson who was there, Maitlem Al-Hammadi, stated, "I think I saw Robert hit Justin first."   Disc. JWATSON-000365.   Jessica Holder, a patron of Billy's that night, stated after a guy got in his face "[t]hen Robert hit him (Watson)."   Disc. JWATSON-000368.   While there are accounts that Mr. Watson inquired about Mr. Bryant's identity after the altercation, there is also a statement by Mike Phillips, a patron at Billy's that night and a friend of Mr. Bryant, who reported very specifically to the FBI that after Bryant hit Watson, Watson left first and Bryant left second a short time later.   Disc. JWATSON-001691.

### b.   The SWAT Team Meetings

In Deputy Church's statement to the FBI he found it intriguing that Mr. Watson had gone to Billy's Bar as he was not known to patronize that establishment but made no statement about teasing or harassment towards Mr. Watson regarding the fight.   Disc. JWATSON-000222. Deputy Church does state that he and several SWAT team members were angry about the attack on their friend and fellow deputy. *Id.*   Deputy Church recalled specific statements of "this shit ain't gonna stand" and "we gotta figure out who did this" from team members but NOT from Mr. Watson.   *Id.*   Upon clarification Deputy Church reported that this meant if Bryant were stopped by a MCSO Deputy, he would not be given any breaks.   *Id.*   Deputy Church clarified;

3

> In other words, if the individual had been drinking, he would be arrested for DUI.   If he was speeding, even a few mph over the speed limit, he would be ticketed.   He would not be given a break.

Disc. JWATSON-000222.   Deputy Church stated that the team then conducted their training and the matter involving Watson was not discussed again by the SWAT team.   *Id.*   However, Sergeant Cross stated that "[he] did not recall anyone saying anything about getting revenge on the individual who threw a punch at Watson," and that he knew of "no code red being issued from the higher ups in the department."   Disc. JWATSON-000194.   Deputy Parton stated to the FBI that he recalled the SWAT team members giving Watson a hard time about going to Billy's Bar in the first place more than anything else.   Disc. JWATSON-000178.   Additionally, Deputy Parton "did not recall anyone egging WATSON on or telling WATSON to seek revenge on the guy that hit him."   *Id.*   These statements stand in stark contrast to each other but all denounce the theory that Mr. Watson called for the members of the SWAT team to conduct any retribution.   Related to this, Deputy Zeissler reported that "CAPTAIN WATSON told the SWAT team during a training session that 'CAPTAIN BERRY is out to get everyone and you need to stick together.'"   Disc. JWATSON-000173.   In contrast, Deputy Edde reported that he "did not recall CAPTAIN WATSON coming to the SWAT team and telling the team they had to stick together."   Disc. JWATSON-000149.   None of the SWAT team members reported a long term issue with or ongoing conversations regarding fight at Billy's Bar.

### c.   **The Hunt For Bryant**

Over the next few weeks Deputy Watson was continuously assigned to the geographic area where Billy's Bar is located.   The MCSO divides the county into 15 geographical zones each one ranging in size, population, and density.   Alabama Highway US 231/431 is the principal road

4

through the Hazel Green area.  Hazel Green is an unincorporated city in the northern part of Madison County, with a population of 3,630 people according to the 2010 census.  Just south of Billy's Bar, on the west side of 231/431 is the local Wal-Mart, with the Hazel Green High School just further south of that on the east side of 231/431.  The Highway 231/431 corridor is the primary road in and out of the area. The government purports to show the AVL times and dates to indicate that Deputy Watson was hunting for Mr. Bryant.  Reason suggests that if a reasonable fear existed that Deputy Watson was in fact hunting for Mr. Bryant that he should have been removed from the area altogether where Mr. Bryant was known to patron and place him in any number of other zones patrolled by the MCSO.  It is likewise reasonable to believe that Deputy Watson knew that US 231/431 was the principal road through the zone he was detailed to monitor and that he would, in fact, monitor that roadway conducting traffic stops on all makes and models of vehicles.   There is a report that on one occasion Ms. Pinchock, a frequent patron of Billy's and friend of Mr. Bryant, came out and there were two MCSO deputies in separate vehicles shining lights in vehicles and asking about Mr. Bryant's truck.  Disc. JWATSON-000169.   However, there is no indication that it had anything to do with the fight that had taken place at Billy's nor that one of the deputies was Mr. Watson.  *Id*.

There was never any statement about Mr. Watson wanting to have "eyes on the inside" as the government purports.  Amanda Billings was a frequent patron of Billy's and did text Mr. Watson on a regular basis.   During one of those occasions Ms. Billings did tell Mr. Watson that Mr. Bryant was at the bar.   The government again implies an unlawful intent on Deputy Watson's part by stating he drove back and forth on US 231/431, stopping other vehicles but releasing them.  What they fail to mention is that there were countless numbers of vehicles of all types/colors

5

stopped by Deputy Watson throughout this time, in the area of Billy's Bar on US 231/431, and that Deputy Watson would stop and release vehicles without citations after having a brief discussion with the drivers.

Finally, the government seems to imply through their arguments that law enforcement must avoid the areas that are more likely to produce illegal activity, such as Billy's Bar; this is just an unreasonable expectation of law enforcement.

### d.  Traffic Stop On August 22, 2012

To the best of the undersigned attorney's knowledge, there are no interviews where Billy, owner of Billy's Bar, stated that Mr. Bryant was "acting normally" and was not intoxicated prior to leaving the bar that night as purported in the governments' sentencing memorandum. However, Mr. Bryant did walk out of Billy's Bar on August 22, 2012, with several friends including Mr. Hoffman, Mr. Phillips, and Mr. Stillwell.  Mr. Phillips reported standing in the parking lot of Billy's on August 22, 2012, and that "[a]s soon as BRYANT made the turn (onto Hwy 231/431), *two* county police cars shot out from behind BILLY'S and started following BRYANT." Disc. JWATSON-001692, (emphasis added).  Mr. Phillips stated that one vehicle came out between Billy's and a church next door while the other vehicle came up from south of Billy's. *Id.* Furthermore, Mr. Phillips stated that he and another patron, Mr. Chuck Stillwell, "immediately jumped into a truck and started following BRYANT and the police cars northbound on US 231/431." *Id.*  Mr. Phillips stated that they pulled up on the traffic stop no more than five minutes later and there were at a minimum of four police cars on the scene.  *Id.*  Mr. Phillips was certain of the timeframe and "reiterated that he pulled up on the scene no more than five minutes

6

after BRYANT left BILLY'S parking lot." *Id.* Contrasted with the statement provided by Mr. Stillwell where he states that "[a]s soon as BRYANT'S truck was out of sight, [he] then observed a police car 'flying' south on US 231/431 and then turn around in the same median BRYANT had just used." Disc. JWATSON-001693. Mr. Stillwell does not say that he went with Mr. Phillips in a truck but rather that he placed a call to Mr. Bryant "to let him know that a police car was coming up behind him and to 'drive straight.'" *Id.* Mr. Stillwell stated he did not get in a vehicle nor come up to the scene of the traffic stop. *Id.* Ms. Pinchock stated she didn't recall the night of the traffic stop specifically because "she, STEPP and BRYANT were smoking a lot of weed back then." Disc. JWATSON-000169.

Investigator Nettles conducted the investigation of the traffic stop on August 22, 2012. Disc. JWATSON-000162. After being transported to the hospital for treatment, Deputy Watson was immediately interviewed by Inv. Nettles regarding the incident. *Id.* Deputy Watson indicated that he initiated the traffic stop after he observed the driver make an improper lane change. *Id.* Deputy Watson asked for the driver's license and if there was a weapon. *Id.* "The driver stated that he had a pistol in the vehicle then provided WATSON with his pistol permit." *Id.* "WATSON went back to his vehicle in order to run the tags but observed the driver to move so he returned." *Id.*

Deputy Stanley Bice was on duty on the evening of August 22, 2012. Disc. JWATSON-000157. Deputy Bice was parked off US 231/431 south of Meridianville, Alabama, (South of Hazel Green) while having a conversation with Deputy Lane. *Id.* Deputy Bice recalls Deputy Watson "go out with a vehicle in the northern part of the county" but did not give any concern to it and continued in his conversation with Deputy Lane. *Id.* Deputy Bice recalls the

7

initial radio traffic being normal but shortly thereafter noted that the 911 center received no response to inquiries regarding Deputy Watson's status. *Id.* This alarmed the officers and they ended their conversation and proceeded northbound on US 231/431. *Id.* While in route they heard Deputy Watson call "'10-39', which signifies that the fight is in progress." *Id.* The two officers then "raced to Watson's location with all due haste" taking them five or six minutes to get to the location. *Id.* Deputy Bice indicated that Deputy Lane located Deputy Watson and Mr. Bryant, that Bryant was unconscious on top of Deputy Watson in a ditch, and that they rolled Mr. Bryant off to handcuff him without incident. *Id.*

Deputies checked on Mr. Bryant and when he became alert again, Deputy Bice stated that "Bryant started to 'howl and thrash around.'" Disc. JWATSON-000158. Deputy Bice describes how "Bryant continued to thrash and howl incoherently at the top of his lungs" and how "Bryant was kicking and squirming while continuing his howling." *Id.* Mr. Bryant continued to resist the officers' efforts to get him to the far edge of the shoulder and he repeatedly tried to get to his feet as if to flee. Deputy Lane "dry stunned' Bryant in an attempt to control him." *Id.* A dry stun is when the cap of the taser is removed with the electronic prongs exposed. *Id.* According to Deputy Bice this form of tazing Mr. Bryant was not within MCSO policy, nor did it have any effect on Bryant. *Id.* Mr. Bryant then kicked Deputy Lane below his knee. *Id.* Deputy Bice further states, "[a]t about this time, Sergeant Brooks arrived and came down into the ditch" and "[a]s he (Sergeant Brooks) approached, Bryant was on his side and kicked back at Brooks hitting him in the groin." *Id.* Mr. Bryant then attempted to get to his feet again but Sergeant Brooks, while on his knees from the kick, "tried to bear hug Bryant and eventually rode him back to the

8

ground." *Id.* "Bryant was banging his head on the ground, and Brooks tried to hold his head down to prevent this." Disc. JWATSON-000159.

Inv. Nettles noted that Deputy Church had transported Bryant to the hospital, not the ambulance that was on scene, per MCSO policy. Disc. JWATSON-000162. Additionally, Lt. Salomonsky stated that on August 22, 2012, "WATSON's AVL showed that WATSON was not lying in wait for BRYANT." JWATSON-000172.

### e. Testimony In State Court

On December 12, 2012, Mr. Watson appeared in State District Court during a Preliminary hearing against Mr. Bryant.

> At Mr. Bryant's preliminary hearing, Defendant Watson testified under oath that he had never seen Robert Bryant before the night of the traffic stop, and that he did not previously have an encounter with Robert Bryant at Billy's Bar. Those statements were false, as Defendant Watson then well knew, because Defendant Watson had, in fact, seen Robert Bryant before the night of the traffic stop, and did, in fact, have a previous encounter with Robert Bryant at Billy's Bar.

See Plea agreement, factual basis.

### f. Internal Investigation

It is critical to note that an Internal Investigation was conducted by members of the MCSO. See GAR-00057. In a report to Captain East from Lieutenant Salomonsky, Sergeant Brooks, and Sergeant Cross it reported on the investigation of Deputy Watson related to his conduct and behavior, impartial attitude, uses of force, and basic rules governing testimony. *Id*. The report specifically states;

9

We recognize that this fact may lead the reasonable and prudent person to theorize that Deputy Watson sought the identity of Bryant in order to "target" him during the course of his official duties out of a desire for retribution for the earlier altercation.   This fact alone led us to conduct the investigation, and throughout the investigation we can conclude that ( based on all information presently available), this is the only evidence with which any suggestion can be made that Deputy Watson's "impartiality" was compromised at the point he decided to initiate the traffic stop.   When asked in direct interview, Deputy Watson adamantly denied that he was aware that he was about to initiate a traffic stop on Robert Bryant (i.e. specifically the man with whom he had an earlier altercation) and the fact of who the driver was or how the driver related to his personal life did not in any way factor in to his decision to engage Bryant at the time he activated his emergency equipment.   In short, we have presently discovered no concrete evidence (beyond the speculative and 'hear-say' stipulated) with which we can conclusively impeach Deputy Watson's statements regarding his impartial motive for initiating the traffic stop.

*Id*.   The same report addresses the testimony in that "Watson explained that he perceived the question as having only 'yes' or 'no' as possible responses" and that "he found himself uncomfortable with either answer, and selected to respond 'No' as the best response to reflect the knowledge he had at the time of the traffic stop."   GAR-00058.   Finally, the Garrity report states "we find that his [Deputy Watson's] response to the allegation of purposely lying during testimony to be plausible" and continues on to state that "[w]e feel that Deputy Watson did not understand how best to answer the question he was asked and answered to the best of his ability without malice."   *Id*.   The report finishes by stating "[w]e therefore cannot conclude that Deputy Watson's answer during the hearing (under oath) constituted a premeditated lie."   GAR-00059.

In an audit on the investigation to Sheriff Blake Dorning by Captain Charles Berry, Capt. Berry notes the inactions of some while lauding the actions of Lt. Salomonsky and Sgt Brooks, the authors of the above cited report.   GAR-00015.   Capt. Berry stated "[i]t appears that Lt. Salomonsky and Sgt. Brooks took self-initiated action to investigate this incident and bring it up to their chain of command and it appears that after Chief Deputy Stephens, was notified of the investigation and outcome he failed to act."   *Id.*   Additionally, "[i]t also appears that Capt. Steve

10

Watson, Lt. Chuck Zeisler, and Sgt. Cross had knowledge of the Bar Altercation, Traffic Stop, and Court Room Testimony and failed to Document and Report and Act." *Id.*   Lt. Zeisler went so far as to send Deputy Forrest Edde to Judge Hundley's chambers to make contact with the Judge and ask if the judge if he believed the testimony given by Deputy Watson was truthful.  *Id.*   It appears that if there was wrongdoing or a cover-up, that this extended far higher and much more in depth than a single Deputy, but included many others including Sergeants, Lieutenants, Captains and the Chief Deputy.   Any wrongdoing that may have happened was not the sole act of Mr. Watson.

### g.  **Additional Inconsistencies**

There are additional inconsistencies that further demonstrate that, outside of the undisputed facts, (that a fight took place, a traffic stop took place, and Mr. Watson lied under oath) we may not ever know what happened.  Mr. Watson was originally charged in making threats related to a SWAT team photograph which is also discussed in the government's sentencing memorandum. Deputy Church himself clarified in his FBI statement that "his image was *not cut* out of the middle of the SWAT team photograph but rather cropped out of the end of the photo."  Disc. JWATSON-000122.  (Emphasis added).  Deputy Church believed it was Mr. Watson who had manipulated the photograph but it was, in fact, another member of the SWAT team who had blown the picture up that cut out several members of the team who were near the edges of the photograph. Deputy Church was not present when the photograph was developed so he had no direct knowledge of who altered the photograph or why the photograph was printed in the manner it was. There is also no reference, in any statement, regarding the room where the SWAT team was located "going silent" when the photograph was allegedly discussed between Deputies Watson and Church, as stated by the government.

11

Deputy Church also claimed that Mr. Watson had pointed a gun to the back of his head – a serious allegation.   However, there are NO statements indicating that this incident actually took place.   Deputy Church did not see anything, nor did any member of the SWAT team that was present at the group training the date this alleged incident took place in an open common area full of SWAT team members.

Deputy Davis was a SWAT team member who made a statement to the FBI and did not mention the picture or the pointed gun, and maintained that Deputy Watson never requested he help him track down Mr. Bryant.   Disc. JWATSON-000137. Deputy Daversa was a member of the SWAT team who made a statement to the FBI and failed to mention the picture, the pointed gun, and stated that Deputy Watson never asked him to help find Mr. Bryant. Disc. JWATSON-000139.   Deputy Edde, a member of the SWAT team since its inception in Madison County, made no reference to the alleged photograph incident, to the alleged gun incident, nor to being asked to look for Mr. Bryant. Disc. JWATSON-000147.   Deputy Gray, also a member of the SWAT team failed to mention the alleged photograph incident and the alleged gun incident but specifically stated that he was not asked by Mr. Watson to help identify the individual from the bar fight or serve as a lookout on the night of the traffic stop. Disc. JWATSON-000150.   Deputy Montemagno, who actually developed the photograph in question, made a statement that Mr. Watson did not ask him to help identify the individual from the bar fight or serve as a lookout on the traffic stop. Disc. JWATSON-000151.   Deputy Montemagno was also a SWAT team member and makes no reference to "the room going silent" or any alleged gun incident. *Id.* Deputy Scratchard was a SWAT team member who also makes no reference to the alleged photograph incident, or the alleged gun incident, and also stated that he was not asked to help find Mr. Bryant

12

or act as a lookout on the night of the traffic stop. Disc. JWATSON-000153.   Deputy Parton was a member of the SWAT team who was present at the training when then Deputy Watson showed up after the bar fight but he failed to inform the FBI that he had heard or had seen anything related to the alleged photograph incident or the alleged gun incident. Disc. JWATSON-000178.   Deputy Parton stated that Mr. Watson did not ask him to participate in identifying, locating, or assisting in any hunt for Mr. Bryant.   *Id.*   Sergeant Cross was also present with the SWAT team the day they were discussing the bar fight but makes no reference to the alleged photograph or alleged gun incident while affirmatively stating that Mr. Watson never asked him to help locate or identify Mr. Bryant. Disc. JWATSON-000194.

Deputy Countess was NOT a member of the SWAT team but was the trainee riding with Deputy Church on the night of the traffic stop.   Deputy Countess stated to the FBI that he was told by his trainer, Deputy Church, to stay in the car and "just hang out for a second and let me see what is going on."   Disc. JWATSON-000155.   Deputy Countess found the comment odd but states that Deputy Church did not tell him to "look the other way" as Deputy Church had claimed he did. Disc. JWATSON-000156. (see also FBI statement by Mr. Raymond Thornton who was friends with Deputy Church at the time and stated that "[w]hen the first news articles were published regarding the traffic stop and murder, CHURCH 'went south' and stopped hanging out with THORNTON" as well as Deputy Church telling Mr. Thornton "that he told COUNTESS, his ride along on the night of the traffic stop, to look the other way." Disc. JWATSON-000181.)   It is interesting to note that Deputy Countess did state that he "believed BRYANT was drunk the night of the traffic stop and stated that he remembered smelling it (alcohol) on BRYANT."   *Id.*   This directly corroborates Deputy Watson's statement regarding the reason for initiating the traffic stop

13

in the first place.   It is curious that so many SWAT team members were interviewed by the FBI and yet they *all* failed to mention anything about the alleged photograph cutting, the room going silent, or the gun incident as purported by the government.   However, they all state that they were *not* approached by then Deputy Watson nor were they requested to assist him in his alleged search and revenge on Mr. Bryant.

The inconsistencies go so far as to include that Mr. Bryant has maintained throughout that it was, in fact, Deputy Church "who assaulted him at the traffic stop, not Justin Watson."   Disc. JWATSON-000187.   Even after being shown evidence that it was Deputy Watson, Mr. Bryant has maintained that it was Deputy Church.   Mr. Watson admitted and testified to the fact that he initiated the traffic stop.   However, Mr. Bryant believes to this day that it was Deputy Church who conducted the traffic stop and the alleged assault.   It is reasonable to assume that Mr. Bryant would know better than anyone who had been there that night and their conduct.   Yet we have a substantial inconsistency regarding even this simple fact.

Again, the facts of this case that are beyond dispute are; 1) sometime near the end of June and beginning of July 2012 there was a fight at Billy's Bar that included, but was not limited to, Mr. Watson and Mr. Bryant, 2) Mr. Watson, while employed as a Madison County Sheriff's Deputy, initiated a traffic stop on August 22, 2012, the subject of which was Mr. Bryant, and 3) on December 10, 2012, Mr. Watson testified before a state court judge that he had never seen Bryant before the night of the traffic stop and that he had not previously had an encounter with Bryant at Billy's Bar.   Those are the undisputed facts of this case.   There are too many inconsistencies throughout the investigation and reports compiled to be certain of *anything* else.   The focus and

14

reasonableness of the sentence should be on the fact Mr. Watson testified untruthfully about knowing Mr. Bryant before the evening of August 22, 2012.

### III.   <u>LEGAL ARGUMENTS</u>

The Supreme Court, in *United States vs. Booker*,[2] established that a district court judge is to impose a sentence upon a defendant that is "reasonable."   The sentence must be informed by the advisory guideline range, but ultimately driven by the sentencing factors set forth by Congress in 18 U.S.C. §3553(a).[3]   The Supreme Court clarified in *Booker*, that the sentencing guidelines are advisory in nature.[4]   As such, they must be adapted to fit the unique circumstances presented to the Court and in keeping with the sentencing directives set forth in 18 U.S.C. §3553(a).   In *Kimbrough v. United States*, 552 U.S. 85, 128 S.Ct. 588, 169 L. Ed. 2d 481 (2007), the court notes that sentencing courts may vary from the advisory guideline range based solely on policy considerations, including disagreement with the policy underlying the guidelines in a case. Additionally, in *Kimbrough v. United States,*[5]   the Supreme Court notes that sentencing courts may treat the guidelines as "one factor among several" to be considered in imposing an appropriate sentence and that Courts may vary from the advisory guideline range based solely on policy.[6] The Court's "overarching" duty is to "impose a sentence sufficient, but not greater than necessary

---

2   543 U.S. 220 (2005).

3   *Id*.

4   *Id.*

5   552 U.S. 85 (2007).

6   *Id.* at 90.

15

to accomplish the goals of sentencing."[7]

The Supreme Court has found that District Courts have a broad base of information not contemplated by the sentencing commission when drafting sentences.[8]

> The Commission has not developed any standards or recommendations that affect sentencing ranges for many individual characteristics. Matters such as age, education, mental or emotional condition, medical condition (including drug or alcohol addiction), employment history, lack of guidance as a youth, family ties, or military, civil, charitable, or public service are not ordinarily considered under the Guidelines. See USSG. Manual §§ 5H1.1-6, 11, and 12 (Nov. 2006). These are, however, matters that § 3553(a) authorizes the sentencing judge to consider.

See, *e.g.,* 18 U.S.C. § 3553(a)(1)).[9]

"[I]t is fair to *assume* that the Guidelines, insofar as practicable, reflect a *rough approximation* of sentences that *might* achieve § 3553(a)'s objectives."[10] The Sentencing Judge may take into consideration that the Guidelines sentence should not apply "because the Guidelines sentence itself fails properly to reflect § 3553(a) considerations."[11]

To that end, the following arguments are made based on the multiple, and very unique circumstances applicable to Mr. Watson's life.  A departure and/or variance from the advisory guideline range is warranted in this case on the "ground that its circumstances present an 'atypical case' that falls outside the 'heartland' to which the United States Sentencing Commission intends

---

[7]*Id*. at 101, *see also United States v. Pepper*, 131 S. Ct. At 1212-43.

[8] *Rita v. United States*, 551 U.S. 338, 127 S.Ct. 2456, 2561 (2007).

[9] *Id*.

[10] *Id.* at 2465 (majority opinion) (emphasis added).

[11] *Id.*

16

each individual Guideline to apply,"[12] and that, "independent of the Guidelines, application of the sentencing factors in 18 U.S.C. §3553(a) warrants a lower sentence."[13]

### a.  Lesser Sentence Is Warranted In This Case

In addition to – but also independent of – arguments made with respect to the advisory sentencing guidelines, the sentencing factors articulated by Congress in 18 U.S.C. §3553(a) weigh strongly in favor of a sentence of time served with 3 years' supervised release in this case.   Each factor is discussed, in turn, below. To that end, Justin Watson argues below under both legal frameworks: 1) that a departure from the advisory guideline range is warranted on the "ground that his circumstances present an 'atypical case' that falls outside the 'heartland' to which the United States Sentencing Commission intends each individual Guideline to apply," [14] and 2) that, "independent of the Guidelines, application of the sentencing factors set forth in 18 U.S.C. §3553(a) warrants a lower sentence."[15]   This analysis will attempt to show that the facts of this case are implicitly simple.   Additionally, it will show that the reasonable sentence in this case is probation with 3 years' supervised release and fine or forfeitures, or, in the alternative, Home Detention pursuant to §5F1.2. of the U.S.S.C. for the three years, and he asks that the Court sentence him accordingly.

### b.  Relative Weight To Be Given The Sentencing Guidelines

The Eleventh Circuit has clarified that the sentencing court should listen to the allocution of the

---

[12]*Rita v. United States*, 551 U.S. 338, 127 S.Ct. 2456, 2561 (2007).

[13]*Id. citing Booker*, 543 U.S. 259-60.

[14] *Rita v. United States*, 551 U.S. 338, 127 S.Ct. 2456, 2561 (2007).

[15]  *Id.* (citing *Booker*, 543 U.S. at 259-60).

17

defendant who may plead personally to the court for leniency and the court should consider a defendant's plea for leniency to determine the appropriate sentence.[16]   Mr. Watson and his family are all asking the court for leniency.

The Ninth Circuit has previously held that the sentencing guidelines, per se, are only a single factor to be considered in arriving at a "reasonable" sentence, and are not to be used as any sort of a presumptive sentence.[17]   In *Rita v. United States*, the Supreme Court recently clarified that while an appellate court may apply a presumption of reasonableness to a district court sentence imposed within a properly calculated guideline range, such a presumption does not apply in the district court.[18]   Specifically, the Court held that "[i]n determining the merits of these arguments, the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply."[19]

*Rita* tells us that sentencing courts are expressly barred from entertaining the weak, non-binding, "presumption" that the Supreme Court has said that appellate courts "may" enjoy. Further, a district court need not say it is applying a presumption in order to be reserved.   It may not say, for example, that it does not see "any reason why the guideline sentence isn't appropriate" in a particular case, or that it cannot sentence below the guideline range unless a defendant has

---

[16]*Green v. United State*s, 365 U.S. 301 (1961); *Unites States v. Tamayao*, 80 F. 3d 1514 (11th Cir. 1996); United *States v. Phillips*, 936 F.2d 1252 (11th Cir. 1991).

[17]  See *United States v. Zavala*, 443F.3d 1165 (9th Cir. 2006), reh'g en banc granted, 462 F.3d 1066 (9th Cir. 2006); see also *United States v. Carty*, 453 F.3d 1214 (9th Cir. 2006), reh'g en banc granted, 462 F.3d 1066 (9th Cir. 2006), and *United States v. Cantrell*, 433 F3d 1269 (9th Cir. 2006).

[18]  See *Rita*, 127 S.Ct. at 2465.

[19]  *Id.*

"presented some kind of good reason."[20]

*Rita* further instructs that appellate courts may no longer give greater deference to the Sentencing Commission's supposed fact-finding (i.e., certain circumstances are "not ordinarily relevant"), than to a district court judge's real findings of fact (i.e., application of a judge's experience and discretion regarding relevancy). [21]   Put another way, a district court's below-guideline sentence – as requested here – cannot be trumped by any deference to "fact-finding" by the Sentencing Commission in the guidelines.

District courts are no longer required – or even permitted, for that matter – to simply defer to the policies contained in the sentencing guidelines.[22]   Specifically applicable to this case, the Ninth Circuit recently vacated a within-guidelines sentence as "unreasonable" because it did "not fall within the 'heartland' of cases to which the guidelines are most applicable, as described by the Supreme Court in *Rita*," and the district court failed to consider the strong mitigating evidence introduced by the defendant.[23]

In a factually dissimilar case, the Seventh Circuit recently affirmed a 70-month sentence for downloading and sharing child pornography, where the advisory guideline range was 121-151 months.[24]   The *Wachowiak* court endorsed the district court's freedom and discretion under *Rita*

---

[20]  See *United States v. Ross*, 457 F.3d 682, 686 (7th Cir. Sept. 11, 2007) (reversing based on those statements).

[21]*Rita* 127 S.Ct. at 2463 ("nor does the presumption reflect strong judicial deference of the kind that leads appeals to courts to grant greater factfinding leeway to an expert agency than to a district judge.").

[22]   *Id.* at 2465, 2468 (district court may conclude that the guideline sentence fails to reflect §3553(a) considerations, reflects unsound judgment, does not treat defendant characteristics in the proper way, or that a different sentence is appropriate, "regardless").

[23]*United States v. Paul*, 2007 WL 2384234, No. 06-30506 (9th Cir. Aug. 1, 2007) (unpublihed decision; see 9th Cir. R. 36-3).

[24]*United States v. Wachowiak*, 496 F.3d 744, (7th Cir. Aug. 1, 2007).

19

to find the sentencing guidelines inadequate. (emphasis added)   The appellate court approved of the district court's review of the §3553(a) factors, and its conclusion that the guidelines failed to adequately account for all relevant sentencing factors.[25]

Moreover, a sentencing court must act independently of the sentencing guidelines, and must evaluate (even if imposing a guideline sentence) whether the sentence complies with §3553(a).   It follows that a district court can be reversed if it fails to act independently, and simply follows those guidelines.   Therefore, although the advisory guidelines call for a sentence in the range of 41 to 51 months, the court does not end its analysis there.   Rather, such a range is only one of the many factors for the Court to consider in arriving at a reasonable sentence. Mr. Watson asserts probation with 3 years' supervised release is a reasonable sentence.

### c.  **Advisory Guideline Range Is Too Harsh; "Greater Than Necessary"**

Congress has directed that the district court "shall impose a sentence sufficient, but not greater than necessary, to comply with" the purposes of sentencing.[26]   In fact, this is the "primary directive" of the sentencing statute.[27]   As stated by one district judge, "fashioning a just sentence cannot be reduced to a mere arithmetical exercise [and] reliance solely on numbers, quantities, offense levels, criminal history categories, and matrices produces an illusory precision that

---

[25]   Among other things, the district court in *Wachowiak* concluded that the defendant's strong expression of remorse, and his introspection and insight into his condition were mitigating factors not adequately accounted for by the "acceptance of responsibility" adjustment and, further, that defendant's nature and strength of character, as testified by his family and friends, etc., were mitigating factors not adequately reflected in the guidelines criminal history calculation.   See *Id.*

[26] 18 U.S.C. §3553(a)(emphasis added).

[27]   See *United States v. Ranum*, 353 F.Supp.2d 984, 986 (E.D. Wisc. 2005); see also *United States v. Pirani*, 406 F.3d 543, 564 (8th Cir. 2005).

20

obscures the fact that sentencing, in the end, must involve the exercise of judgment."[28]

"The sentencing court, as *Rita* teaches, 'filters the Guidelines general advice through § 3553(a)'s list of factors.' The Court arrives at this point in the sentencing analysis convinced that... the applicable guideline, § 2G2.2, cannot be given deference and produces an unreasonable sentencing range even before considering the sentencing factors in § 3553(a). It has reached this conclusion reluctantly because of the importance of the guidelines to a rational sentencing protocol." The same can be said in all types of cases.   Federal Judge John Gleeson explains: "Over the past 25 years, the way the political winds were blowing, whenever there was a change, it was a change to add severity."[29]

The sentencing guidelines have often been viewed as too harsh or too severe.[30] A sentence that is too long for the offense does not promote respect for the law but, rather, the opposite is true.[31] The sentence imposed upon the defendant in this case must not pass the "point of diminishing returns," but must be reasonable and fair in light of all relevant circumstances and factors. There's clear dissatisfaction with the current financial crimes guidelines. Newsweek, in an article that appeared in June 2014, described the guidelines and sentences proposed by them as

---

[28] *United States v. Biheiri*, 356 F.Supp.2d 589 (E.D. Va. 2005).

[29] http://www.newsweek.com/2014/07/04/nonsensical-sentences-white-collar-criminals-256104.html

[30]  See August 9, 2003 speech of Justice Anthony Kennedy at the ABA Annual Meeting ("our resources are misspent, our punishments too severe; our sentences too long… the sentencing guidelines are responsible in part for the increased terms… [and they] should be revised downward.") Ranum, 353 F.Supp.2d at 986 n.1 (Many judges have criticized the guidelines not only for their inflexibility, [but also for] their unnecessary harshness in many cases"'"; United States v. Khan, 325 F.Supp. 218, 277 (EDNY 2004) (partial quote of Kennedy speech)

[31]  See United States v. Williams, 2006 WL 68559 (11th Circuit Jan. 13, 2006) (noting that too lengthy a sentence promotes disrespect for the law)

21

"nonsensical" and "draconian".[32] Federal Judge Jed S. Rakoff explains the federal sentencing guidelines are "too simplistic, too harsh, and often fail to offer punishments nuanced enough to fit the crime."[33]

Following *Booker*, sentencing judges are now able to use their discretionary power to fashion a sentence that is proper and not too harsh and are doing so. Judges are departing on a regular basis from the guidelines over the government's objections. "In 2003, about 83.4 percent of all sentences for financial fraud offenses, including insider trading, fell within the government guidelines, according to commission data. That number has now fallen to about half of all sentences, with a large portion of them falling below the range." Mr. Watson's case should lead the pack and permit the Court to join the growing ranks of departures from unfair policies.

### d.  Pre-Booker Sentencing Guidelines Departures

The sentencing guidelines themselves acknowledge the importance of using departures to fashion a specific sentence that "fits" the person and conduct before the court in each case. As acknowledged by Congress in the Sentencing Reform Act and by the Commission when the first set of guidelines were promulgated, "it is difficult to prescribe a single set of guidelines that encompasses the vast range of human conduct potentially relevant to a sentencing decision."Departures, therefore, perform an integral function in the sentencing guideline system. Departures permit courts to impose appropriate sentence in the exceptional case in which mechanical application of the guidelines would fail to achieve the statutory purposes and goals of sentencing.  Departures also help maintain "sufficient flexibility to permit individualized sentences when warranted by mitigating or aggravating factors not taken into account in the

---

[32]http://www.newsweek.com/2014/07/04/nonsensical-sentences-white-collar-criminals-256104.html

[33]http://www.newsweek.com/2014/07/04/nonsensical-sentences-white-collar-criminals-256104.html

22

establishment of general sentencing practices."   28 U.S.C. §991(b)(1)(B).[34]   The guidelines, as is, fail to capture the complexities and breadth of mitigating factors in this case. Therefore, Defendant argues for downward departure from the guideline as follows.

## IV.   DEPARTURES APPLICABLE

The following are some, but not all, of the Departures that this Honorable Court may take into consideration as they relate to Mr. Watson.

### 1.   Aberrant Behavior §5K2.20

Application Note 3 specifically allows a sentencing court, when analyzing a departure for aberrant behavior, to consider "the defendant's (A) mental and emotional conditions; (B) employment record; (C) record of prior good works; and (D) efforts to mitigate the effects of the offense."   These factors are discussed in greater detail below, and they all strongly militate in favor of a downward departure and/or a lesser sentence for aberrant behavior.   When ultimately released, Mr. Watson plans to return to his home and help provide for his family.

#### a.   Mental and Emotional Condition

Mr. Watson is a kind, protective father who made a poor decision while in a difficult position. Mr. Watson stated in his Garrity hearing that at the time of the testimony he was nervous, unsure, and unclear, yet he knows that he lied when asked about his previous encounters with Mr. Bryant. He fully acknowledges his responsibility for his conduct; he acknowledges the harm of his statements while under oath; and took steps to mitigate his conduct, to include continuing to serve for three more years as an exemplary Sheriff Deputy.   Mr. Watson has submitted fully to the Court.

---

[34]   USSG §5K2.0, Background (internal citations omitted) (emphasis added).

23

### b.  Employment Record

The discovery provided by the government has selected portions of the employment record of Mr. Watson as a Sheriff Deputy.  The Madison County Employee Performance Review and Appraisal forms (performance report) provide a glimpse into the years that Mr. Watson served, and served honorably, while with the MCSO.

On January 10, 2010, and again on July 10, 2010, a performance report was conducted and approved by both Mr. Watson's supervisor as well as the Sheriff/Chief Deputy wherein Mr. Watson received between 5's and 8's on all measured areas on a scale of 1-10, (1 being unsatisfactory, 5 being satisfactory, and all ratings below a 4 or above an 8 requiring explanations as to the exceptionally low or high ratings).  Disc. JWATSON-001168, see also Disc. JWATSON-001225.  At this time Mr. Watson was still relatively new to the force and the ratings and commentary reflect this.  On January 12, 2011, another performance report was accomplished with similar marks. Disc. JWATSON-001169.  The pattern appears to be that performance reports were to be conducted bi-annually; however, the discovery does not include all of the performance reports that would have been accomplished during Mr. Watson's career.

On July 26, 2012, while in the middle of the time in question before this Court, a performance report was conducted and likewise approved by both Mr. Watson's supervisor and the Sheriff/Chief Deputy wherein Mr. Watson received 8'sand 9's on all measured areas on a scale of 1-10. Disc. JWATSON-001151.  He is described as "good knowledge of the job and turns in very detailed work," that he "follows instructions well," he "does his job with limited instruction" and that "Deputy Watson is a leader on this shift."  *Id.*

24

On January 25, 2013, another performance review was conducted. Disc. JWATSON-001152. It specifically states, "Deputy Watson writes a good report and displays an above average knowledge of his duties." *Id.* Additionally, "Deputy Watson is very proactive on patrol" and "requires limited instruction." *Id.* It concludes with, "Deputy Watson is well respected by his peers and the public he serves." *Id.* This performance evaluation was conducted over a month AFTER the testimony given in the state court, which is the basis of the case before this Honorable Court.

It is interesting that on January 29, 2013, Deputy Watson was placed on administrative leave, along with Deputy Church and Deputy Scratchard. However, this was not due to any conduct related in reference to Mr. Bryant, a fight, a traffic stop, or a testimony. These deputies were placed on administrative leave because of an officer involved shooting wherein members of the SWAT team, of which these deputies were at that time, were called to the scene of a potentially dangerous and violent setting. After everything that had allegedly happened, Mr. Watson was trusted enough to be called to this type of scene. A Shooting Review Board was convened on February 5, 2013, where it was concluded that the incident was within policy and procedures of the Madison County Sheriff's department and all deputies were returned to full status. Disc. JWATSON-001153-57.

Deputy Watson continued to receive near excellent performance reviews long after the perjured testimony in December 2012. On January 26, 2014, Deputy Watson received exclusively 8's and 9's with comments including, "[he] is very accurate in his work product," "very thorough in report writing and in situational awareness," and "shows excellent knowledge of different job duties." Disc. JWATSON-001214. Additionally, the performance notes state that

25

"[he] has encountered several situations that weren't routine and he handled the situations excellent" or that "[he] shows great composure in emergency situations." *Id.*

From Mr. Watson's personnel record it also shows that any time force was used it was appropriate and proportional to the incident.  See Disc. JWATSON-001177 (wherein Deputy Watson used a chemical agent to subdue a subject). The personnel records also indicate that Deputy Watson conducted DUI stops without altercation or incident.   Disc. JWATSON-001185. Specifically, Deputy Watson was praised on Sept 17, 2009, for an incident wherein he stopped a vehicle with four people in it.  *Id.*  Deputy Watson determined that all four occupants of the vehicle were impaired and arranged for all four to be transported to their homes.  *Id.*  Later that same night he responded to a call wherein speakers had been taken.  *Id.*  Deputy Watson recognized the speakers, having seen them in the early stop and was able to track the property down and ultimately arrest some of the very people he had released based on the breaking and entering charges.  *Id.*

### c.  <u>Record of Prior Good Works</u>

The defendant has a lifetime history of good works.  Mr. Watson has been involved in countless charitable organizations while in school, through his religious affiliations, as well as charitable contributions made while a Sheriff Deputy.  Mr. Watson has given time to organizations serving the local community, welfare organizations, and any other such program that has presented itself with a need throughout his entire life.  Mr. Watson served Honorably as an Officer in the United States Army before dedicating his life to Law Enforcement.  Mr. Watson has acted as a loving father to his two daughters he married into and continues to do anything and everything to support them as well as others in his family, including his disabled mother.

26

### d.  Efforts to Mitigate the Effects of the Offense

As shown by the above referenced performance reports and other records, Mr. Watson attempted to mitigate the effects of the offense every day since his testimony.   While not directly caused by Mr. Watson, all charges were dismissed against Mr. Bryant who also settled a civil suit against the MCSO out of court.   Mr. Watson continued to perform the obligations of a Sheriff Deputy to the best of his abilities for YEARS after his testimony.   Mr. Watson was a trainer, a supervisor, and, as noted in his performance reports, a leader in the MCSO as well as an ambassador of the MCSO to the local community.   It was not until the media became interested in this case that Mr. Watson felt any kind of pressure to leave the MCSO.   Because of all of these factors, Mr. Watson asks this Honorable Court for a downward departure, independent of any other departure or variance.

### 2.  Military, Civic, Charitable, or Public Service; Employment-Related Contributions; Record of Prior Good Works § 5H1.11

The United States Sentencing Commission contemplated that there would be, at times, individuals who were generally individuals of excellent character that, for one reason or another, violated a provision of law and would be before federal courts for sentencing wherein their prior good works could be relevant to the courts to consider in arriving at a sentence that is not greater than necessary in light of all factors.   The Federal Sentencing Guidelines specifically state that "[m]ilitary service may be relevant in determining whether a departure is warranted, if the military service, *individually or in combination with other offender characteristics*, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines."   USSG § 5H1.11 (emphasis added).   Mr. Watson served in the United States Army after serving in both the Junior ROTC program in High School, as well as the ROTC program while attending the

27

University of North Alabama in Florence, Alabama.   Mr. Watson was awarded numerous awards and commendations while in the training and active duty portions of his military career all of which given for exemplary individual duty performance far above the standard established for military service.   Mr. Watson participated in many deployment preparation and deployment support events throughout his career.

Mr. Watson separated from the Army with an Honorable discharge to follow his lifelong dream of being in Law Enforcement wherein he began to work for the Madison County Sheriff Department.   Mr. Watson's primary duty assignment was that of a patrol officer in which he had several occasions to respond to accidents or other emergency situations that required him to provide life saving assistance.   Mr. Watson was also called to the most difficult scenes while on duty due to his extensive training.   In all circumstances, Mr. Watson was able to overcome the horrific scenes and difficult situations in which he found himself.   Mr. Watson's actions directly lead to a safer community and impacted all members of the Madison County community.

In *United States v. Canova*, the Second Circuit affirmed a downward departure for an ex Marine who also served as a volunteer fire fighter and performed life saving acts, including emergency delivery of babies, and saving a person from a burning building qualified the defendant for a downward departure pursuant to USSG § 5H1.11.[35]   The present case is similar to the case of *Canova*, in that Mr. Watson not only served in the military, but then continued his service as a Sheriff Deputy with additional civic, charitable, and public service.   Because of this, Mr. Watson asks this Honorable Court for a downward departure, independent of any other departure or

---

[35] *United States v. Canova*, 412 F.3d 331 (2d Cir. 2005), see also *United States v. Taylor*, 499 F.3d 94 (1stCir. 2007) (finding that the court appropriately considered other civil and civic contributions of the defendant when applying a5H1.11 departure).

28

variance.

### V.   18 U.S.C. §3553(A) –MITIGATING FACTORS WEIGH IN FAVOR OF A LESSER SENTENCE AND VARIANCE

Under *Booker*, every sentence meted out by a federal court must conform to the seven factors discussed in 18 U.S.C. §3553(a), which gives a detailed enumeration of the appropriate sentencing factors to be considered in this case. Even when a mitigating factor does not qualify for (or is prohibited from) a traditional downward departure under the guidelines, the sentencing court may still consider and apply such a factor in fashioning a sentence below the advisory sentencing guideline range. It is all too easy for a court to provide a mechanical recitation of these factors and announce that they have been considered. Counsel recognizes that conducting a thorough analysis of the sentencing factors requires more work for the sentencing judge, but in this case, justice requires more than just a rote recitation of the factors and a quick annotation in the record.

In this case, there are a number of mitigating factors that weigh in favor of a sentence below the advisory guideline range, as set forth below.

#### 1.   Nature and circumstances of the offense.

Defendant has taken full responsibility for his actions in this offense, and acknowledges the serious nature of his offense. At the same time, he submits that a sentence of incarceration for this offense is greater than necessary in order to fully, adequate, and fairly punish his conduct.  Mr. Watson was testifying for the first time in his life regarding an incident that he knew had brought him, and others, under scrutiny within the MCSO.

#### 2.   History and characteristics of the defendant.

Mr. Watson is a man who has dedicated his life to public service as well as serving his family.  Aside from the instant matter, he has been a positive member of society his entire life

29

who, by all accounts, is a loving and caring father and husband. He has been honest and forthright with this Honorable Court as well as the community he served for years by pleading guilty. Throughout all of this, his family and friends have remained loving and supportive.

**3. Sentence to reflect seriousness of offense, promote respect for the law, and provide just punishment.**

Mr. Watson asks the Court to sentence him to three years supervised release. This sentence is sufficient to accomplish all of the goals of sentencing set forth by statute. Further, given the specific, unusual circumstances presented by this case, as viewed through the §3553(a) factors, the advisory guideline range is more than is necessary to reasonably meet these needs. He submits that this sentence adequately satisfies these considerations, without violating the statutory directive of having a sentence "not greater than necessary."

**4. Adequate deterrence to criminal conduct.**

This is Mr. Watson' first experience with the Federal justice system in his many years of life, and the Court most assuredly has his full and undivided attention. The collateral consequences of Defendant's actions-i.e., strict supervised release terms, inability to travel when and where he wants to without permission, the stain of a felony conviction, thousands of dollars in fees, potential lawsuits, all provide a level of deterrence above and beyond any term of imprisonment he may serve. A term of three years supervised release is sufficient to accomplish this goal of sentencing.

**5. Protect the public from further crimes of the defendant.**

The public need not worry about Mr. Watson being a repeat offender.  As previously stated, even before he was accused, he conducted himself for years as a law enforcement officer and re-dedicated his life to serving others.  Although it's not the way he envisioned it, he is grateful there can finally be resolution at the end of this situation. For the last year this has hung

30

over his head and restricted his liberties and freedoms.   Everything has been tainted and affected by these proceedings.   All Mr. Watson wants to do is return home and provide for his family the best he can.

### 6.   Provide the defendant with needed education and vocational training, medical care, or other correctional treatment.

Mr. Watson is not in need of vocational training, education, medical care or other correctional treatment. As mentioned previously, he has a degree and is capable of immediately being a productive member of society.   After leaving the MCSO Mr. Watson has maintained full employment of any kind in order to continue to support his family and meet all of his financial obligations.

### 7.   Sentence Requested conforms with Other Similar Cases

Cases in which an officer commits perjury while under the oath are more common than the undersigned counsel first believed but are often not prosecuted.   Rather, they are mentioned in other cases where the courts find that the officer did in fact testify falsely but it appears that no actions are taken against the officer.  *See United States v. Stewart*, 931 F.Supp.2d 1199, 1210 (S.Dist.FL 2013) (wherein the court established that an officer committed perjury but it appears that no action was taken against said officer), *see also Arnold v. McNeil*, 622 F.Supp. 2d 1294, (M.Dist.FL 2009) (where the court addresses the issue of attributing the officers known perjured testimony to the prosecution but took no action against the officer for perjury).   These cases demonstrate that officers do testify, commit perjury, and no criminal actions are taken against them.

In *United States v. Veal*, multiple officers were charged with one count of conspiring to obstruct the due administration of justice and engaging in misleading conduct designed to hinder,

31

delay, and prevent the communication of information relating to the death of a narcotic suspect and one count of knowingly misleading state investigators regarding the death of the same narcotic suspect.[36]   In *Veal*, officers caused the death of a narcotic suspect/informant and proceeded to lie about the nature of the events leading up to his death as well as create or manipulate evidence there from, specifically cutting/tearing a shirt of the lead officer to support the later false testimony of an altercation that did not take place.[37]   Even after all of this, officers received 21 months sentence for actively attempting to cover up a murder and the officer who committed the actual deadly act received a sentence of thirty months of imprisonment.[38]

In a case out of the Northern District of Alabama the defendant in *United States v. Thomas*, repeatedly lied while under oath.[39]   In *Thomas*, the defendant continued to lie, repeatedly to the court which stated they found it "'unbelievable' that she had chosen to go to trial and lie again."[40] The Honorable Judge Blackburn stated "because you lied and lied and continued to lie in trial, you are getting a twenty-one month sentence.   It's sad . . . but I think it's the right sentence."[41] Because of the defendant's repeated persistence in lying over and over and over again, the court felt obligated to sentence the defendant but did so at the low end of the guidelines range.[42]   These cases illustrate that the requested sentence by the government, or even that of the guidelines recommendation, is greater than what is necessary to impose a sentence sufficient to meet the

---

36  United States v. Veal, 153 F.3d 1233, 1238 (11th Cir. 1998)

37  *Id.*

38  *Id.*

39  United States v. Thomas, 193 Fed. Appx. 881, 885 (11th Cir. 2006)

40  *Id.*

41  *Id.*
42  *Id.*

enumerated goals of sentencing.

## VI.    CONCLUSION

Clearly Justin Watson has learned from his actions. He is a broken man and only hopes to be able to go home and provide for his family. His dreams of a lifelong career in law enforcement are now dead, even though for years after his testimony he believed that through hard work he could show to the MCSO, and the rest of the community, that he truly loves to serve and protect the members of Madison County and the State of Alabama.  He thought he had weathered the storm, done all that was asked of him, and could continue with his dream only to have it snatched back from him due to media pressures, actions of others above him, and factors outside of his ability to control.  We believe a sentence of time served and 3 years of supervised release is sufficient but not greater than necessary to comply with the purpose of sentencing.  In the alternative, a period of Home Detention is also reasonable.

Dated this the 15th day of November 2016.

Respectfully submitted,

/s/Michael T. Tewalt
Michael T. Tewalt
100 Jefferson Street, Suite 200
Huntsville, Alabama 35801
(256) 288-3044
attorney.michael.tewalt.@gmail.com

### CERTIFICATE OF SERVICE

I hereby certify that on November 15, 2016, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all parties of record.

Michael T. Tewalt

33

34